A. C. Muldoon v. Commissioner. Victor H. Skinner v. Commissioner.
Muldoon v. Commissioner
Docket Nos. 29833, 29844.
United States Tax Court
1953 Tax Ct. Memo LEXIS 154; 12 T.C.M. (CCH) 897; T.C.M. (RIA) 53274; August 11, 1953
*154 Respondent determined income for the taxable years 1944 through 1947 from the apparent increase in net worth of the taxpayer partners' assets plus living expenses and determined additions to tax for fraud. The closing net worth figures were taken from the taxpayers' books which showed certain real estate not at cost, but at values which included unrealized appreciation. The taxpayers contend there was no increase in net worth because they had a large amount of cash at the beginning of the taxable period. 1. Held, there was an increase in net worth although not so large as determined. Increase in net worth and annual income redetermined. 2. Held, further, the evidence is insufficient to sustain fraud. A previous determination of deficiencies as to 1944 was the subject of deficiency notices to these taxpayers in 1947. One taxpayer filed a petition before the Tax Court which was dismissed in 1949 for failure to prosecute and the deficiencies were paid. 3. Held, section 272 (f) precludes the present deficiency notice issued in 1950 as to 1944 in the absence of fraud and this Court is without jurisdiction as to the tax of this taxpayer for such year. Herald A. O'Neill, Esq., and Warren A. Taylor, Esq., for the petitioners. Douglas L. Barnes, Esq., for the respondent. TIETJENS
Memorandum Findings of Fact and Opinion TIETJENS, Judge: These cases were consolidated as they concern the income derived from operations of these taxpayers as partners in the taxable years 1944 to 1947, inclusive. The respondent determined the following deficiencies and additions to tax against the petitioner Muldoon: 50%
Sec. 294
Year
Deficiency
Addition
Addition
1944
$17,776.67
$ 9,130.34
1945
16,414.55
8,207.28
$ 951.88
1946
2,287.31
1,143.66
365.97
1947
830.94
415.47
44.52
Totals
$37,309.47
$18,896.75
$1,362.37 In addition an addition for delinquency of $571.83 for 1946 was determined. The respondent determined the following deficiencies *156 and additions to tax against the petitioner Skinner: 50%
Sec. 294
Year
Deficiency
Addition
Addition
1944
$20,404.98
$10,836.43
1945
18,450.87
9,225.44
$1,068.03
1946
2,958.44
1,479.22
473.20
1947
954.44
477.22
152.71
Totals
$42,768.73
$22,018.31
$1,693.94
The returns of the partnership and of the taxpayers for the years involved were filed with the collector of internal revenue at Tacoma, Washington. Findings of Fact The petitioner A. C. Muldoon was born in 1884. The petitioner Victor H. Skinner was born in 1883. During some of the years between about 1911 and 1915 they were associated as partners in the operation of saloons and gambling places in Panama. They subsequently lived in various South or Central American countries, in Cuba and in Miami, Florida. In late 1939 or early 1940 Muldoon went to Anchorage, Alaska, and a year later moved to Fairbanks where he now resides. Skinner went to Fairbanks early in 1941. In November 1941 Muldoon and Skinner as partners, bought and furnished a place to be operated as a roadhouse called the "Silver Slipper" in the vicinity of Ladd Air Field, near Fairbanks. They did not open this place *157 for business. The Government, desiring the property for use in connection with the Air Base, bought the property from them for $19,700 in February 1943. In July or August 1943 Muldoon and Skinner leased a small building on the river street in Fairbanks and installed a bar which they operated as partners. This place, called the "Wonder Bar" was twenty by thirty feet in area. Muldoon ran the Wonder Bar with the aid of one bartender, and sold beer, whiskey and wine. Skinner was employed at Ladd Field in a civilian job, attended to the cleaning of the bar after hours, and each morning deposited the previous day's receipts in the bank and delivered the cash register tape to the bookkeeper. Muldoon and Skinner operated the Wonder Bar until April 1946 when they sold it. In 1947 Skinner moved to Long Beach, California, where he now resides. In May of 1947 Muldoon and Skinner as partners, bought land outside the city limits of Fairbanks and built a night club called the "Casa Blanca." A new partnership with Joseph Carelli as one partner and the partnership of Muldoon and Skinner as the other was formed to operate the night club. The Casa Blanca was operated from September 1947 until February *158 1950 when the place was destroyed by fire. Gambling was illegal in the city of Fairbanks, but was carried on at the Casa Blanca. The gambling was conducted by George Thompson who paid the taxpayers $8,000 in 1947 and agreed to turn over fifty per cent of his profits. Skinner filed an income tax return for 1940 in March 1941 and paid a tax of $22.80 thereon. In March 1942 he filed a return for 1941, disclosing a tax of $156 which was paid in two installments. His return for 1942 showed a tax of $426 on which two quarterly installments were paid and the balance discharged under the Current Tax Payment Act of 1943. His address was given as Northern Hotel, Fairbanks. Muldoon and his wife filed a joint return for 1941, disclosing a tax of $24 of which $6 was paid in March 1942 and the balance in December 1942. The address given on the return was Northern Hotel, Fairbanks. They filed no return for 1940. The return for 1942 showed no tax due. The books of the Wonder Bar were kept by Thomas Wright who prepared the partnership returns filed by the taxpayers for 1944 and 1945 and the individual returns filed by Muldoon for those years. Skinner also filed returns for such years. The partnership *159 returns for 1943 and 1944 reported net losses of $4,192.84 for 1943 and $4,473.74 for 1944. The records of the Wonder Bar were examined by Revenue Agent Walter H. Fleet who made a report in 1946 recommending adjustments. The agent found that $11,844.06 deducted for repairs in 1943 and $7,177.48 deducted for repairs or purchases in 1944 should be capitalized and that overceiling wages paid in 1943 in the amount of $1,325 and in 1944 in the amount of $5,821 were unallowable as deductions. He proposed to allow additional deductions for depreciation on leasehold improvements amounting to $623.37 in 1943 and $3,390.66 in 1944. The effect of the adjustments was to add to each partner's income the amount of $4,176.42 for 1943 and $2,710.17 for 1944. Fleet also reported "Sales and cost of sales were correctly reported. Rent, taxes and other deductions revealed no unallowable items." Muldoon and his wife filed a timely return for 1943 and paid a tax of $46.14. In 1948 they paid additional tax of $1,052.18 assessed for 1943 upon the basis of the revenue agent's report, plus interest. Skinner filed a declaration of estimated tax for 1943 and paid $1,818.35 in December 1943. His return for *160 1943 showed tax overpaid and $1,936.55 was refunded. Additional tax of $1,533.48 was assessed for 1943 upon the basis of the revenue agent's report and was paid in 1952, with interest. Muldoon filed a declaration of estimated tax for 1944 and paid two installments of $638.76 each in June and October 1944. He filed an individual return for 1944 showing income of $800 from rents, loss of $2,236.87 from the Wonder Bar, and no tax due, and claimed an overpayment of $756.94 to be credited on his estimated tax for 1945. Additional tax of $484 was assessed upon the basis of the revenue agent's report and was paid in 1948. Skinner filed a return for 1944 showing earnings of $4,959.82 as an employee of the War Department, tax withheld in the amount of $867.20, loss from the Wonder Bar $2,236.87, net income of $2,722.95, tax in the amount of $446, payments of $756.94 of estimated taxes and overpayment of $1,178.14 to be credited on 1945 tax. Subsequently in 1947 a deficiency of $1,267.87 was determined upon the basis of the revenue agent's report. Skinner filed a petition to contest the determination before the Tax Court, Docket No. 15437, but did not appear at the hearing in 1949 and the *161 proceeding was dismissed. Skinner paid the deficiency, plus interest, in 1952. The partnership returns for 1944, 1945 and 1946 showed the following information: INCOME
1944
1945
1946
Gross receipts
$58,200.16
$45,548.81
$6,960.00
Inventory Jan. 1
2,266.00
24,500.00
Purchases
55,549.00
19,940.66
3,480.00
Invent'y Dec. 31
24,500.00
20,500.00
Gross profit
24,885.16
21,608.15
3,480.00
Rent Income
3,603.00
4,555.00
Total Income
24,885.16
25,211.15
8,035.00
DEDUCTIONS
Salaries and
wages
$11,742.06
$ 8,753.39
$2,400.00
Rent
1,790.00
1,810.00
450.00
Repairs
8,845.88
354.27
Interest
620.00
Taxes
3,138.31
4,093.85
750.00
Depreciation
136.95
4,352.81
Other deduct'ns
3,705.70
1,794.27
2,960.00
Total deduct'ns
29,358.90
21,158.59
7,180.00
Net income or
(loss)
(4,473.74)
4,052.56
855.00
Each partner's
share
(2,236.87)
2,026.28
427.50 Among the deductions claimed on the 1946 return was $1,000 for travel expenses. Muldoon's individual return for 1945 showed income of $2,026.28, tax of $207 due; $421.67 paid on declaration of estimated tax and $214.67 overpayment to be refunded. Skinner's return for *162 1945 showed income from the partnership $2,026.28, salary from the War Department $4,037.80; tax $1,268.58, upon which $740.80 was paid by withholding and $1,178.14 on a declaration of estimated tax; and an overpayment of $650.36 to be refunded. In March 1947 the taxpayers were in Florida. A partnership return for 1946 was prepared by an accountant there from information furnished by the taxpayers, and was signed by both partners. Skinner filed a return for 1946 reporting $2,534.40 as total wages from the War Department and $427.50 as income from the partnership, tax of $415 and $415.96 withheld from wages. The overpayment of $.96 was asked to be refunded. The taxpayer's address was given as Box 647, Fairbanks. Muldoon did not file an individual or joint return for 1946. His failure to file a return was without reasonable cause. At the end of 1947 Muldoon engaged an accountant to open a set of books covering the operations of Muldoon and Skinner and the night club. This accountant later accepted other employment and turned the books over to B. B. Holstrop, an accountant engaged in practice in Fairbanks. Holstrop prepared the returns for 1947 of the partnership of Muldoon and *163 Skinner and Carelli, and of the partnership of Muldoon and Skinner; and Muldoon's individual return. The return of Muldoon, Skinner and Carelli showed that that partnership was organized on September 14, 1947, and that its business was operation of a night clubcabaret. It reported gross receipts of $25,536.90; income $16,458.33, deductions of $16,026.47, and net income $431.86. The distribution was a profit of $1,506.05 to Carelli and a loss of $1,074.19 to Muldoon and Skinner. The partnership of Muldoon and Skinner reported this loss, and showed income from rents $7,428. Deductions of $5,939.61 were claimed and net income was shown as $414.20. Muldoon's individual return for 1947 reported income of $207.10, no tax due, and $89 paid on a declaration of estimate, which was asked to be refunded. Skinner filed a return for 1947 in which he reported income of $207.10 from the partnership and no tax due. The original returns for 1947 gave the taxpayers' addresses as Box 5, Fairbanks. In April 1949 amended returns for 1947 prepared by Holstrop were filed. The amended return covering operations of the night club was in the names of Muldoon and Carelli. It showed gross sales of $19,307.12, *164 gross profit of $9,705.25, and amusement income of $8,769. Deductions were claimed amounting to $18,637.38 and a net loss of $163.13 was shown. This was distributed as a profit of $1,483.03 to Carelli and a loss of $1,646.16 to Muldoon. The amended return of Muldoon and Skinner showed rental income of $10,428, deductions of $8,046.50, net income of $2,381.50 distributed $1,190.75 to each partner. Muldoon's individual amended return for 1947 reported income from the partnership with Skinner and loss from the partnership with Carelli, giving a net loss of $455.41. Skinner's amended return for 1947 reported income from the partnership of Muldoon and Skinner of $1,190.75 and claimed deductions of $500 for travel expenses from Long Beach to Alaska in July 1947 and return and $120 as per diem expenses for two months on the trip, leaving $570.75 as taxable income on which a tax of $1 was computed. In December 1943 Muldoon and Skinner bought for $1,500 an eighty-acre tract of land on which were two buildings. In March 1944 they purchased Lot 5 of Block 73 in the Townsite of Fairbanks. They paid $6,000 for this property. The lot extended from 5th Avenue to 6th Avenue. Facing 5th Avenue *165 was a two-story furnished house known as 409-5th Avenue. The taxpayers remodeled the house, converted the heating system from coal to oil and bought additional furniture. Muldoon thereafter used this house as his residence. One of the buildings on the eighty-acre tract was moved to the other end of the lot and was identified as 408-6th Avenue. Some alternations were made in this building and a well was drilled on the lot. The taxpayers subsequently rented this for the production of income. In June 1944 they bought premises known as 413-5th Avenue. There was a small shack on the lot. It was remodeled and an extra room added. In August Muldoon purchased for $2,000 Lot 4, Block 73, which fronted on both 5th and 6th Avenues. Buildings on this property, known as 411-5th Avenue and 411a and b, were remodeled. There were three cabins called "wanigans" which were connected to make one dwelling. Another small building was moved onto the 6th Avenue end of the lot, identified as 410-6th Avenue, and was remodeled. In April 1946 the taxpayers bought a lot with dwelling house and furniture known as 503-7th Avenue. The purchase price was $9,000 and a mortgage for $4,000 was placed upon the property *166 by the partners. A well was drilled on the property, some wiring was done, and additional furniture installed. In June 1946 the taxpayers bought a large lot with a house known as 1301 Gillam Way and contents for $4,000. This house was remodeled and additional furniture provided. Another house was bought and moved onto this lot and identified as 1303 Gillam Way. In July the taxpayers mortgaged this lot and the buildings for $5,000. In August 1946 the taxpayers bought for $1,500 a lot with an old building known as 501-6th Avenue. They bought the remaining part of a hotel which had been partially destroyed by fire, moved this structure onto the lot, drilled a well, and remodeled. In May 1947 the taxpayers bought land and built a night club-cabaret called the Casa Blanca which was operated by Muldoon and Carelli. The taxpayers mortgaged some of the real estate to produce funds for building the night club. $14,000 was borrowed in May 1947 and $2,000 in August 1947. A mortgage on the Casa Blanca for $12,000 was executed by Muldoon on November 25, 1947, and by Skinner in California on December 17, 1947, and was recorded on January 16, 1948. Another $10,000 was borrowed in January 1948 *167 on the same property. New books were opened covering the operations of the night club and the rental properties. In recording the houses and lots on the books the accountant used figures given him by Muldoon. These figures were Muldoon's estimate of the values of these properties as of the end of 1947 rather than their actual costs. There had been a rise in the market values of improved real estate in Fairbanks, and the market values of these properties were generally higher than their costs. Muldoon showed these values in order to facilitate borrowing on these properties to finance the construction and operation of the night club. In July 1949 Revenue Agent Marx and Special Agent Lehmicke made an investigation of the tax returns of the taxpayers. The agents went to the office of Holstrop and examined the books of the Casa Blanca. They interviewed Muldoon. The books concerning the operations of the Wonder Bar were at that time deposited at the night club. These books were not shown to the agents. They were subsequently lost in the fire which destroyed the night club. In the course of the interviews Muldoon told Agent Marx that some of the figures concerning the real properties were *168 not costs. He gave corrected cost figures for each property according to his recollection at that time, which figures were noted by Marx. Subsequent to the interview, Holstrop investigated the costs of each property and compiled information in his working papers which were sent to Agent Marx in Seattle for his information. They were subsequently returned and prior to the hearing of this proceeding were examined by Donald E. Hilliard, a Seattle accountant, who prepared a report and a series of schedules from this and other information purporting to show the costs of the rental properties and the night club and the net worth of the taxpayers in the taxable years, as well as giving a summary of the general ledger figures on the properties. The respondent determined the deficiencies herein upon the basis of the supposed increase in the taxpayers' net worth plus estimated living expenses. Net worth as of December 31, 1947, was taken from the taxpayers' books as $159,701.43. Net worth at the beginning of 1944 was assumed to be $15,000, the approximate amount of the investment in the Wonder Bar at that time, and living expenses were estimated for the four years at $28,000, giving a corrected *169 partnership income of $172,701.43. This was allocated to the taxable years upon the assumption that $18,000 represented rentals, $5,000 was profit from the Casa Blanca and the remainder, $149,701.43, was profit from the Wonder Bar earned during the 27 months of its operation in the taxable years. The allocation was as follows: 1944
1945
1946
1947
Rental net profit (est.)
$ 3,000.00
$ 4,000.00
$ 5,000.00
$ 6,000.00
Estimated net profit from operation of
Casa Blanca opened 9/14/47
5,000.00
Profit from operation of Wonder Bar
from 1/1/44 to date sold 4/12/46
1944 12 mos. - 12/27
66,533.97
1945 12 mos. - 12/27
66,533.97
1946 3 mos. - 3/27
16,633.49
Sub-total
$69,533.97
$70,533.97
$21,633.49
$11,000.00
Add: Contributions per partnership re-
turns filed
None
None
None
266.67
Wage disallowance
5,821.00
Ordinary net income as corrected
$75,354.97
$70,533.97
$21,633.49
$11,266.67
Ordinary net income reported
(5,134.08)
4,052.56
855.00
2,381.50
Additional partnership income
$70,220.89
$66,481.41
$20,778.49
$ 8,885.17
The deficiencies were determined upon the basis of the foregoing computation of income. *170 Robert W. Slater was a member of a partnership doing business in 1944 as Alaska Construction Company. The firm was principally engaged in residential construction work. In September 1944 Slater agreed to sell to Muldoon and Skinner two small cabins, described as wanigans, and move them onto Lot 4 of Block 73, for the price of $3,500. Alaska Construction Company also did other work for Muldoon and Skinner in 1944 for which $2,000 was paid and at 413-5th Avenue tore down a shed and an old house and built a new house for a contract price of $1,540. This amount was not paid and was the subject of litigation which resulted in a judgment against Muldoon in 1946. Slater's firm did work on 413 and 411-5th Avenue and 410-6th Avenue. Slater gave estimates of the fair market values of several of the properties bought by the taxpayers at the time of their acquisition in 1944 or 1946. A condensed balance sheet according to the taxpayers' books as of December 31, 1947, shows the following: Cash
$ 244.10
Merchandise inventory
14,594.28
Casa Blanca building
109,941.41
Houses and improvements
89,410.00
Furniture and fixtures - Casa Blanca
23,413.82
Furnishings - houses
13,000.00
Preliminary construction expenses
4,000.00
Land and lots
19,650.00
Other assets
5,005.88
$279,259.49
Less reserve for depreciation
4,589.38
$274,670.11
Current liabilities
$ 60,414.05
Notes payable
46,000.00
Capital - Carelli
8,554.63
Muldoon and Skinner
159,701.43
$274,670.11
*171 The following shows (1) the values of the rental properties and Muldoon's residence as shown on the books as of December 31, 1947, (2) the costs as given by Muldoon to Agent Marx in 1949, and (3) the costs as computed by accountant Hilliard from the data assembled by accountant Holstrop. These figures include furniture where furnished by the taxpayers. In column numbered (4) are the higher of Slater's estimates of the market values of the houses and lots without furnishings: Property
(1)
(2)
(3)
(4)
409-5th
$ 26,350
$ 9,350
$15,600
$14,500
408-6th
6,400
2,650
3,737
3,500
413-5th
9,850
3,600
4,537
4,000
411-5th
14,400
4,500
6,387
6,000
410-6th
5,200
3,300
2,462
3,500
503-7th
10,800
11,300
9,800
501-6th
4,660
4,665
3,255
2,500
1301 Gillam
23,950
23,950
13,264
11,500
1303 Gillam
12,950
11,450
5,200
5,000
Totals
$114,560
$74,765
$64,242
$50,500
The valuation at which the Casa Blanca appeared on the books as of December 31, 1947, was $142,355.23. The cost, according to information procured by Holstrop, was $113,022.21. Against this was offset the amount of $3,000 said to represent furniture stolen by tenants *172 of the taxpayers. As of December 31, 1947, the Casa Blanca had a cost basis to the taxpayers of $125,000 in addition to a liquor inventory of $14,594.28. The other real estate with buildings and furnishings owned by the taxpayers at that time had a depreciated cost basis of $70,000. Taking into account the debts of the taxpayers and the interest of Carelli in the Casa Blanca, the taxpayers' net worth on December 31, 1947, was $85,000. On January 1, 1944, the taxpayers had a net worth of $25,000. During the years 1944, 1945, 1946 and 1947, they withdrew income from their business operations for use as living expenses and for personal use $24,000, in addition to $800 rents received and used by Muldoon in 1944 and the salary received by Skinner from the War Department in 1944, 1945 and 1946. No part of the deficiencies for 1944, 1945, 1946 and 1947 was due to fraud with intent to evade tax. Each of the taxpayers failed to make and file a declaration of estimated tax for 1946 within the time prescribed therefor. This failure was without reasonable cause. Skinner failed to make and file a declaration of estimated tax for 1947. This failure was without reasonable cause. Skinner *173 filed a declaration of estimated tax for 1945. Muldoon filed declarations of estimated tax for 1945 and for 1947. A deficiency letter was mailed April 30, 1947, to Victor H. Skinner relating to his income tax liability for 1943 and 1944 which was the subject of a petition filed by him with this Court in Docket No. 15437. The proceeding was dismissed July 13, 1949, for failure to prosecute. The deficiency letter mailed to Skinner on March 8, 1950, which was the subject of the petition filed herein in Docket No. 29844 relates to his income tax liability for 1944, 1945, 1946 and 1947. Opinion These cases were heard in Seattle, with one of the taxpayers coming from Fairbanks, and the other from Long Beach, California. The events giving rise to the income involved occurred in Fairbanks. One witness from Fairbanks was present. The original books covering a part of the period under question have been destroyed by fire. Under these circumstances both parties have experienced difficulties in assembling and presenting evidence. The respondent computed the income of the taxpayers in the years involved by use of the net worth increase method, and determined partnership income for the four *174 taxable years to be $172,701.43 of which at least $166,000 was not reported upon the partners' returns. The income was computed and allocated as shown in our findings and the deficiencies result from that determination and allocation. On the other hand the taxpayers have submitted a computation from which it would appear that their net worth declined, rather than increased, and that their tax returns reported more income, chiefly through failure to deduct sufficient depreciation, than they should have returned. They start with an opening net worth of $80,621.17, which includes $55,900.48 in cash, and compute closing net worth as $80,196.03, less a depreciation reserve of $13,087, or $67,109.03, and compute withdrawals for living expenses at $20,326.68. The net worth increase method of estimating income when large amounts of income are found and the records do not adequately show the true income is at best an approximation. In the present case there are wide differences in the beginning net worth, closing net worth and estimated withdrawals for living expenses, as calculated by the respondent and by the taxpayers. The respondent's investigation has not disclosed any source, legal *175 or illegal, of the unreported income. The respondent has allocated most of it to the Wonder Bar. It is implied that the taxpayers were conducting a gambling venture as they had done in other places and that the income was derived from that. The taxpayers deny that they had any income from gambling except from the night club in late 1947, or any income other than that reported on their returns. There was testimony that gambling was effectively barred in the city and the Wonder Bar was too small to accommodate gambling. They attack the respondent's computation as failing to recognize a large amount of cash said to have been on hand at the beginning of 1944, as including unrealized increment in value of real properties owned at the end of 1947 and as assuming too large an amount as withdrawals for living expenses during the years. They say that they came to Alaska with some $80,000 in cash and that they had some $55,000 in cash remaining at the beginning of 1944. According to the taxpayers, the history of the cash fund of $80,000 was as follows: The money was accumulated in gambling ventures, saloon and restaurant business ventures and poker playing in South America, Central America, *176 or Cuba prior to about 1925. When the taxpayers came to Alaska, each had about $40,000 in cash in his suitcase. Muldoon worked for a short period for a railroad as a cook while at Anchorage and after reaching Fairbanks worked as a bartender. When Skinner arrived in Fairbanks, by March 1941, he had $40,000 in his suitcase in packets of $5,000 each, and turned this money over to Muldoon for safekeeping. He took a job as fireman tending a boiler at Ladd Air Base, as a civilian employee of the United States Army. In November 1941 the taxpayers bought the Silver Slipper for $30,000. With it they acquired a safe in which they placed the remainder of this money. Muldoon lived at the Silver Slipper until they sold it in February 1943 for $19,700. Then Muldoon took the safe to his room until they opened the Wonder Bar. They kept the safe in that building and sold it with the bar in 1946. They invested $11,844 in leasehold improvements in 1943 and their liquor inventory at the end of 1943 was $2,266. During 1944 the bulk of the remaining cash of $55,900 was invested. The investments of $22,234 in the liquor inventory and $7,177 in further improvements of the Wonder Bar are accounted for in the *177 1944 tax returns which were audited in 1945 or 1946. The taxpayers compute their investment in houses and improvements at about $29,000 during 1944, and fix their cash balance at $3,463.56 as of the end of 1944. There are a number of inconsistencies and discrepancies revealed in the evidence which add to the difficulties of appraising it. There are also charges and counter charges of bad faith concerning examination of the books of the Wonder Bar period. Agent Marx said he asked for all the books and none were furnished except the journal and ledger made up late in 1947 which he examined and found correctly to show the income for 1948 and from which he computed the taxpayers' net worth at the end of 1947. Muldoon said the agent was told the books of the Wonder Bar were at the night club but that the agent didn't go there, and that the agent said he didn't need to see the books as he could look at the property and tell the taxpayers where they stood. Marx did not know at the time of his investigation that these books had been examined earlier by Agent Fleet who reported that sales and cost of sales were correctly stated. Fleet disallowed $5,821, about half, of the deduction claimed *178 for salaries and wages on the 1944 return of $11,742.06 as being overceiling payments. Muldoon said that he ran the bar with the aid of one bartender. Unexplained is the implication that the partners paid a bartender nearly $1,000 a month. If this is not the case and there were other employees, at least we must deduce that the taxpayers paid their employees about double the ceiling wages. They paid $1,800 a year for rent for the building which was the smallest bar in Fairbanks and on which they expended $19,000 for improvements. The taxpayers have no verification of their statement of the amount of cash brought to Alaska. They mention a distrust of banks which they say did not insure depositors, yet they daily deposited the bar receipts. It is noted that after the partners had bought the Silver Slipper, and, according to their testimony, still had some $50,000 in cash remaining in their possession, Muldoon, in filing his tax return for 1941 in March 1942 paid $6, one quarterly installment, and did not pay the balance of $18 until December of 1942. In March 1942 Skinner paid $100 on account with his return showing a tax of $156 for 1941, and paid the balance in September 1942. In *179 1943 when Skinner filed his return for 1942 showing a tax of $426, he paid quarterly installments in March and June. While not determinative, these circumstances do not tend to corroborate the taxpayers' statements of the possession of a large amount of cash. There is no explanation for the sudden and extensive investment of practically all the $80,000 hoard in the brief span of 1941 to 1944 after they had kept it practically untouched since 1925, according to the history given. On the other hand, Revenue Agent Marx and Special Agent Lehmicke testified that Muldoon represented to them in 1949 that $30,000 was the total stake of the two partners when they came to Alaska, and that after taking a loss on the Silver Slipper and investing in the Wonder Bar, they had only two or three thousand dollars in cash remaining. Marx was told that the investment in the bar at the beginning of 1944 was about $15,000. We think the evidence fairly shows that there was a substantial increase in the net worth of the taxpayers during the years involved which is unexplained and that they realized substantial income which was not reported on their tax returns for those years. On the other hand, we are *180 convinced that the respondent's determination of the amount of this unreported income was excessive. We have, therefore, redetermined the amount of the partnership income for the taxable years, and the deficiencies will be recomputed under Rule 50. The respondent fixes the net worth as of January 1, 1944, at $15,000 on the basis of the investment in the Wonder Bar. The partners had bought an eighty-acre tract of land with some buildings for $1,500 in December 1943. In addition to the investment in the Wonder Bar, a small liquor inventory, and possibly two thousand to three thousand dollars in cash, they had a deposit of $1,000 on the lease, a cash liquor bond of $2,500 and a mortgage receivable of $3,500. From these circumstances we have found their net worth as of January 1, 1944, to be $25,000. The respondent's figure of $15,000 as beginning net worth appears too low and the taxpayers' figure of about $80,000 is incredibly high. With reference to the net worth of the taxpayer partners at the end of 1947, the chief difference in the computations depends upon the figures used in connection with a number of houses and the night club, bought or constructed by the partners during *181 1944, 1946 and 1947. The ledger figures set up on the books for the houses at the end of 1947 were given the accountant by Muldoon. The respondent has used these figures as representing the taxpayers' investment in the different properties in computing the increase in the partners' net worth. The petitioners say that the net worth figures shown on the books fairly represent the values of the properties at the end of 1947 but do not represent costs, and hence, include the increment in value due to a rising real estate market, which increment should not be taxed until realized by sale or other disposition of the properties. Muldoon says that these figures were his estimates of the 1947 values of the properties which were considerably more than their acquisition costs in 1944 or 1946 and that his purpose in stating values rather than costs was with a view to borrowing further funds upon the security of these properties to finance the completion and operation of the night club. It appears that $16,000 was borrowed in 1947 secured by mortgages on various houses and $22,000 was borrowed on mortgages on the night club in late 1947 and early 1948. Revenue Agent Marx testified that Muldoon *182 at first assured him the ledger showed cost figures. Later, when Muldoon said the figures were too high, Marx copied certain detailed figures for the several houses from the ledger on a sheet and Muldoon informed him which items were correct and which were incorrect, giving the correct cost figure according to his recollection, which figures Marx noted on the sheet. This sheet is in evidence as respondent's Exhibit V and the totals for each house are shown in our findings. Marx admitted that if the ledger figures which he used do not represent costs, the deficiencies which were determined upon the basis of such figures are not correct. We have the testimony of Robert Slater, a contractor, who did residential construction work in Fairbanks during the taxable years, including some of the work on the taxpayers' properties. He testified to the rapid increase in real property values in these years, and to the costs of work done upon the taxpayers' properties, and gave estimates as to the market values of most of these properties at the time of acquisition in 1944 or 1946. Our findings of fact show the higher of his estimates of the market values of the houses, without furnishings, at the *183 time of acquisition. The petitioners' Exhibit 1 is a report prepared by Donald E. Hilliard, a certified public accountant, of Seattle. It was prepared from the original ledger made up as of December 31, 1947, the working papers of the Fairbanks accountant, Holstrop, furnished to the taxpayers' counsel in Seattle, deeds to the various properties, correspondence and information furnished by counsel. The report was examined by Muldoon and revisions made according to his recollection of the figures, after which he testified that it was as nearly accurate a statement as could be prepared at the time. The report contains detailed information concerning the costs of the properties. The respondent objected to the report as evidence. It was accepted in evidence as containing a summary of the ledger and a statement of the taxpayers' contentions but not as necessarily conclusive evidence of the facts represented therein. It apears from Marx's testimony that information was assembled by Holstrop and sent to Marx concerning those costs. The papers were returned to Holstrop and later furnished to the taxpayers' counsel. Marx said he was informed that the figures so complied were not complete and *184 probably do not cover all the costs. To some extent the figures given are supported by other evidence, such as Slater's testimony, Muldoon's testimony, the figures given in Exhibit V, and by judgments entered in certain litigation between Slater and Muldoon, copies of which judgments are in evidence. While the figures on Exhibit 1 as to the several houses do not coincide with those on Exhibit V and there are inconsistencies in figures as to single properties, as could be expected in figures given from memory after several years, the totals of the amounts given on these exhibits are reasonably consistent. These amounts and the amounts given as market prices by Slater are all substantially lower than those given in the ledger for the same properties. The accumulative effect of the evidence leads us to the conclusion that the ledger figures used by the respondent as the basis for determining the increase in net worth, and hence the amounts of the deficiencies, are not true costs. From the evidence we have found the actual cost of the several houses and the furnishings of them as of December 31, 1947, amounted to $70,000. The figures concerning the cost or value of the investment in *185 the night club are likewise not in agreement. The ledger figure on the investment to the end of 1947 is $142,355.23. The taxpayers' figure is $113,022.21. The figures available are not in sufficient detail to permit verification. After making some allowance for increase in the market value of the property we find that the investment in the night club by the end of 1947 was $125,000. There were other assets of the partners at the end of 1947, as well as substantial liabilities. They owned a liquor inventory of $14,594.28, a mortgage receivable of $3,500, and other assets of about $2,000. They owed $46,000 on notes payable, and over $60,000 in accrued liabilities and accounts payable. Carelli's interest in the night club, valued at $9,000 to $10,000, should be deducted in computing the taxpayers' net worth. Depreciation on the houses should also be considered. We have concluded from a consideration of all the evidence that the net worth of the taxpayer partners at the end of 1947 was $85,000. The respondent estimated the partners' drawings at $5,000 per year for Muldoon and $2,000 per year for Skinner, who was single and earned a salary from the War Department, or a total of $28,000 *186 for the four years. The taxpayers' calculation admits total drawings of $20,326 for the four years. Skinner had earnings of $11,532.02 in 1944, 1945 and part of 1946. Muldoon asserts that he received a pension of $87.50 per month for his work on the Panama Canal. There has been no verification of this although confirmation would have been simple, and Muldoon's stated occupation in Panama of operating saloons and gambling houses would not justify the assumption that his services there had earned him a pension of that magnitude. The agents were not told of this pension in 1949. We find that the partners drew from the partnership at least $24,000 for living expenses in the four years. These findings lead to the conclusion that there was partnership income in the four years amounting to about $84,000. In the respondent's determination, $18,000 of the net worth increase was allocated to unreported rentals, $5,000 to the night club profits and nearly $150,000 to profits of the Wonder Bar, the last divided equally among the 27 months' operations of the bar during the taxable years. The allocation of so large an amount ot the proceeds of the bar appears unreasonable. Gross sales of about *187 $58,000 and $45,500 were reported for 1944 and 1945, and the 1944 figure was verified by Agent Fleet. Yet the respondent ascribes $66,000 of net income to the bar operations of each year. We have found it necessary to adopt a different method of allocation. It appears from the evidence that the most substantial part of the increase in the taxpayers' net worth occurred in 1944. There was an increase in their investment in leasehold improvements of $7,177, and their liquor inventory increased by $22,234. They invested at least $9,000 in real estate and expended something for improvements. Some money must have been used for living expenses for Muldoon. We conclude that their partnership net income for 1944 was $50,000 of which one half was income to each partner. We further conclude that the partnership net income for the remaining years was $10,000 for 1945; $10,000 for 1946, and $14,000 for 1947. These figures do not include Skinner's wages in 1944, 1945 and 1946 and do not include $800 of rental income treated by Muldoon as his own income on his 1944 return, but do include rental income for the other years. The taxpayers contend that they sustained a loss in 1946 upon the sale *188 of the Wonder Bar. They say it was sold for $30,000, that the stock of liquor was valued at $24,000 and the investment in the leasehold, less depreciation, was $11,647.10, resulting in a loss of $5,647.70. There is no substantiation of the selling price or of the cost of the liquor. The tax return made no mention of such a sale and claimed no loss. The pleadings herein do not seek an adjustment based upon this claim. The accountant's computation indicates that furniture valued at $3,000 was stolen from the taxpayers in 1947. No testimony was offered to establish such a loss and no claim was made therefor upon the tax returns or in the pleadings in these proceedings. If there were any such losses they have been offset by additional income and hence are not considered in our computations. The respondent determined a fifty per cent addition to tax against each taxpayer for each of the four years. This addition is imposed by section 293 (b) of the Internal Revenue Code where any part of the deficiency is due to fraud with intent to evade tax. The burden is upon the respondent to prove fraud. Section 1112, Internal Revenue Code. We do not *189 find affirmative evidence sufficient to sustain this burden. Although we do not accept the taxpayers' story of the vast amount of cash brought to Alaska, and conclude that they have failed to prove that their apparent increase in net worth did not represent unreported income, this negative conclusion is not enough to sustain the additions to tax for fraud. The mere fact of a large understatement of income is not enough. James Nicholson, 32 B.T.A. 977 (1935) aff'd 90 Fed. (2d) 978 (C.A. 6, 1937). There is no revealed source of the unreported income, nor is there evidence of gambling or other illegal activity of the affirmative nature required to establish fraud. The violation of price ceiling laws indicated by Agent Fleet's report is not sufficient. We are unable to affirm the additions to tax for fraud. The respondent has addressed two deficiency notices to Skinner, the first in 1947 relating to the years 1943 and 1944, the second in 1950 relating to the years 1944 to 1947. Skinner filed a petition with the Tax Court, Docket No. 15437, contesting the original determination as to 1943 and 1944, and that proceeding was dismissed in 1949 for lack of prosecution. *190 Under the provisions of section 272 (f) of the Internal Revenue Code, [1] the respondent was without authority to determine any additional deficiency against Skinner in respect of the year 1944, except in the case of fraud. Since fraud has not been proved, the deficiency notice in Skinner's case, Docket No. 29844, is invalid insofar as it applies to 1944 and we are without jurisdiction to determine any deficiency against him for 1944 in this proceeding. See Agnes McCue, 1 T.C. 986. Muldoon is liable for the 25 per cent additions to tax for the year 1946 for delinquency as he failed to file a return for such year and has not shown reasonable cause for such failure. The additions to tax provided by section 294 (d) (1) (A) *191 for failure to file a declaration of estimated tax for 1946, and by section 294 (d) (2) for substantial underestimate of tax for the years 1945, 1946, and 1947, are applicable in the case of each taxpayer. They are to be recomputed upon the basis of our determination of taxable income. In Docket No. 29833, decision will be entered under Rule 50. In Docket No. 29844, an order of dismissal will be entered as to the year 1944. As to the years 1945, 1946, and 1947, decision will be entered under Rule 50. Footnotes
1. Sec. 272: (f) Further Deficiency Letters Restricted. - If the Commissioner has mailed to the taxpayer notice of a deficiency as provided in subsection (a) of this section, and the taxpayer files a petition with the Tax Court within the time prescribed in such subsection, the Commissioner shall have no right to determine any additional deficiency in respect of the same taxable year, except in the case of fraud, * * *↩